Thank you so much. Thank you. Mr. Sullivan? Good morning, Congress. Good morning. This was a murder case, and the defendant was not told who he allegedly murdered until after evidence closed at trial. He was not told in the indictment. He was not told despite repeated requests right before trial or in the middle of trial. Well, he was told one person that he allegedly murdered in the indictment, pre-trial, post-trial. That's right. And then the government said that there were a number of other murders. And the night after, excuse me, the night after jury selection, they finally disclosed a list of who all of those people were. This was someone who they would describe in summation as a global terrorist, as part of a global terrorism network and a conspiracy that operated on six continents and 20 countries. And there was no way to know, and extraordinarily voluminous evidence, what, which of these other murders we were supposed to be defending against. And that had the effect of flipping the burden to disprove. So, for example, just take two examples. One is there was evidence of an online market for suicide policies discussion at page 1782. And then at page 1844, it describes an exhibit that was a video from Mr. Kandik's phone of people chained to a swing set, and then they're murdered and mutilated. Neither of these turn out to be murders that he's held responsible for. But if you're defense counsel going into a trial... Well, defense counsel didn't raise the issue until two days before trial, even though the case had been pending for five years or so. Yes, Your Honor. So two points. One, the government does not argue waiver for the juror or for plain error review. The government argues there was adequate notice, however, because this had been raised throughout the litigation. Well, so two points. The government's not arguing waiver, but our government is arguing that there really was no surprise because this was disclosed at various points throughout, and defense counsel doesn't raise the issue until two days before. Right. And so in that motion that was filed near the end of trial, it says in the first paragraph that the defense didn't realize until it read the government's proposed jury instructions that the trial case would seek to hold their client responsible for murders other than Jake Bilardi's. And so the district court accepted the motion, and so I was just saying... Well, what's the prejudice ultimately? Because the jury instructions specifically said it had to be unanimous as to the person who was killed. Yeah, so it's three points, Your Honor. The first is the unquantifiable prejudice of consuming what are very limited... There were two defense trial lawyers. There was a third person, me, in the background. I was appointed a week before the trial, but really two lawyers consuming their time running down rabbit holes trying to disprove and explore whether they could prove or disprove whether their client was involved in this murder, this murder, or this murder, or this killing, this killing, and this killing. From evidence that contained, you know, evidence of hundreds or thousands of myriad killings, the government points to the complaint at Government Appendix 65 and 67. They associate in that complaint, first on candidate, with killings that they later said were not what they were saying could be possible. I am sympathetic. I am sympathetic to the amount of work and resources this might would consume. What I'm wondering is how you can help us articulate a workable standard for when it's just not enough notice in this case. I mean, if they're saying that they did, and you said it was too many for you to reasonably do, how are we supposed to write law on that? Yeah, I think it's incumbent on the government, as they do in almost any other case, to just say this is the person who was murdered. Right. And it's in the record in that motion at Docket 272 that we asked them, and they wouldn't. And then at Docket 299, which was later in mid-trial motion practice again, saying the government refuses to identify who the murder victims are. So usually the government's just identifying who the murder victims are. And this is an unusual case, but it was the government. So would the standard we need to write be something like, if you ask once and they don't give it to you within two weeks, then there's a problem? I mean, what are you asking us to say as the rule? The rule is, and I think it can be defined from Sturtevant and Murray, is that the government should provide notice before trial so the defendant knows who he's on trial for murdering. You can't advise a client on a plea and have a knowing and voluntary decision whether to plead unless the person knows who they're being charged with murdering and what the proof of that is. When this case is brought here as an extradition and prosecuted like a criminal case, it's the defense lawyer's job to hold the government to its proof on each of the charges. Now, the defense can see the guilt of almost all material support except for the murderers. But it's the defense's job to hold the government to its proof as to each particularly charged murderer. That's impossible. Can I come back, Mr. Silverman, a little bit to my initial question? I'm trying to figure out what the import of the clarity with respect to Velardi is. Because I don't think your argument about flip burden is true there or notice or inability to prepare. I guess it's not exactly a prejudice question. It's more like a harmlessness question, right? Even if we think, even if it's concerning from a sort of chasing after lots of things, it would prejudice your ability and it flips the burden, all of those things. Surely defense counsel here understands and prepares as best as it can to defend against the murder of Velardi. And we don't have a unanimity problem or a double jeopardy problem because special verdict takes care of all that. And I just don't know if we have a notice problem with respect to Velardi and does that make any error or harm. So there's no notice problem as to Velardi. And as to harm, I would make two points. One, in addition to the harm of being unable to advise someone properly on a plea to a case without an internment where no plea offer is necessary, and also the harm of having the resources that you would want to focus on Velardi instead turned all over kingdom come and to many other distractions. And distracting a lawyer is a trial tactic. It does cause harm. And then third, the reality that you can't develop a defense or a legal theory in any case as a lawyer in any position unless you know all the paths to liability. You don't know all the paths to liability unless you know what all the allegations are, all of the charges. And so the government points out what the defense was against Velardi, but that was necessarily a plug-and-play defense that could be applied on the fly to any death if the world of defense lawyers were pushed into where they were expecting that the district court would allow, that the government would just say in summation that their client is responsible for this murder, this murder, this murder, and they needed a universal theory. But also another important point for the court to consider when deciding what to do with this case, there's one other indictment in the Eastern District in 19 CR 402 that had an indictment drafted this way. Untold number of murders, untold number of places, untold number of continents. That appeal has been filed and will make its way here. Just as the RICO statute was started for mobsters in this day, and this district largely used against young men from the Bronx, what will start with terrorism cases, those tools, if allowed to stand, are going to be pointed to everyone. The government below in the papers, and to some extent in their papers in this court, keep analogizing to narcotics death results cases. There were blocks in the Bronx for a six-month period. You have multiple overdoses. If this were allowed to stand, I can imagine an indictment naming 20 people with death results at 20-year minimum, and then you find out after the closed evidence at trial which drug sale your client is responsible for. Or a murder indictment, when the Department of Justice earlier this week said that it will significantly increase use of the death penalty. And the defendant can find out after the close of evidence who they allegedly murdered. What starts here in these cases with extreme facts, and the defense lawyer said in summation, appalling conduct that was conceded, it will spread. Those tools will spread. It would be the government's decision what to do with count one if it were vacated, if the court didn't vacate count five based on our evidentiary argument. But it is important that this court not send a signal to district judges that this is OK. I guess this goes back to Judge Chin's question. If out of the gate a bill of particulars had been filed seeking the names, then we would be reviewing a denial of that, right? Yeah. So I think two important points in response to that. First, the court should still review the motion to dismiss on duplicity grounds, which is fully preserved to be referred to NOVA review. And so it doesn't really matter that there's not a separate application, a separate bill. Second, the bill... Well, I guess I'm just responding to the, you know, the bell, the alarm bell that you're ringing about what the consequences of... I mean, just as soon as you read it, you think, well, why isn't a bill of particulars filed? And it's... I mean, I don't... Who knows what would happen, but it seems like the natural thing. And that's usually... I mean, it usually doesn't even take that. It usually just takes a request to get a name, or the government does it on its own, and in my experience, just submits a letter with the names. So we actually wrote in the motion at Docket 272 that what we had done is asked the government to particularize the deaths. They hadn't refused, and so they did not care for duplicity, and so we made that motion. And the government, at transcript page 1754, after we kept re-raising this issue, says to the district court, they really want a bill of particulars to resolve this. The government understood that that's what it could have provided and should have provided to resolve this issue. They instead took the position below that there was no duplicity. They don't even attempt to make that argument before this court. So absolutely, this could have been remedied by a bill of particulars. It should have been remedied by a bill of particulars. If a bill of particulars had been provided in response to the duplicity motion, there would be no issue here. The duplicity motion made clear that it was necessitated by the government's unwillingness to particularize, and immediately conferred for the government to acknowledge that it understood that. So I do think that that bell that's being rung is the bell that we were ringing before and during the trial. So can I ask about your Rule 807 argument? You didn't mention it in your reply brief. Are you still pursuing it? Yes, Your Honor. Yes, absolutely, we're pursuing it. So then why don't you tell me what facts would have been established by the sibling affidavit that you could not establish without them? Right. So I agree that that's right, that essentially the district judge treated it as though it was cumulative evidence and then pulled that analysis in Rule 807. The evidence that was there could have been pulled together by a defense lawyer in summation. This is a picture of the books on his bookshelf. This is the barium nitrate that was found in his bedroom and pulled together as an argument. But how many of the siblings were the fact of his parents because he was raised by his siblings? I mean, we're not talking about persuasion. I'm actually interested in what facts would have been established by them that you could not get. Yeah, the fact that would have been established is that it was all tied together by the people who observed it firsthand and not by a defense lawyer picking out disparate exhibits and trying to make an argument for inferences. And in fact, these were the firsthand observations of the people who saw the radicalization and not just a lawyer on the other side of the world years later trying to get people to draw that inference from photographic evidence. So we believe that's meaningfully stronger evidence. So can I ask about the death results element? Is there any question on your part? And I saw whispers of this in your argument, but I didn't see it fleshed out that one cannot be responsible for the death of someone who is trying to commit suicide. Like, is that part of what we have to implicitly decide here? And I don't think it was argued strongly enough with the papers for us to know what to do about that. But that's an undercurrent because you admitted that they had noticed about Velarde. Right. So it would seem to me you only prevail if there is some problem with the idea of him getting charged for the murder of someone who intends to kill themselves. Right. So we're not making a sufficiency argument on appeal. We just provided that as background so the court would understand the legal significance of the evidence. I don't think it's as directly relevant to the duplicity point other than that count is a sort of strange hybrid count because you have both a conspiracy element and a factual element. It's really an element under the Eileen element, fact analysis. And it's an outcome element, not an overt act element. But we were just explaining the legal background. That was litigated below in terms of the jury instructions. We're not bringing that to the court. But yes, it's a but-or causation requirement. So it's not just a sum rule. It has to be a but-or cause. So yes, it was the defense view that if somebody is going to die, no matter what, that you would not meet the but-or causation standard under Justice Scalia's analysis in Barrage talking about the scores in baseball games. If you win five to two, a solo home run is not a but-or causation. This is the analysis that's applied in our common-extension assault cases. The parties also cite the Felder case, which have unusual facts. But I don't think that that's an issue that the court necessarily needs to reach. I think it's an area of the law that the parties, for purposes of this appeal, largely agree on. Okay, thank you. We'll hear from you on rebuttal. May I please report? My name is Sarita Kamari Reddy. I am the Assistant United States Attorney in the Eastern District of New York, and I represented the government at trial today. I want to start with the defense counsel's key concession in this case. There was no notice of issue with respect to J. Bullard. The jury clearly found that the defendant was legally responsible for his death. His death was the core narrative of the trial in this case, and it was the core narrative of the complaint at the inception. So is that observation, which obviously I suggested in my questions to Mr. Silverman, does that mean, I mean, it doesn't mean there's not duplicity. I don't even think it means there's not prejudice as to the duplicity, so that there would be a duplicity error. But I think it means that whatever error there was would be harmless under the particular facts of this case. Is that the right way to think about it? I think that's right, Your Honor. I think the jury need only find one death for the elements of this crime, including the enhancement, to be met. And so the court need only reach that conclusion that that particular death, for that particular death, there was no prejudice. And to the extent that there was any prejudice as to other deaths, that is harmless error. I think that is the right way to think about it. Is there an argument that there was even some spillover prejudice as to that one death? I think I heard that. I hear the argument from the defense counsel that essentially because of spillover. Even as to Polardi's death. That maybe the jury wouldn't have found the Polardi death without the other evidence relating to other unknown deaths. I don't think so, Your Honor, for two reasons. One, each of the deaths that the government argued would meet this element in closing involved a separate storyline. It was Polardi in a suicide attack. The Bosnia witnesses family members, specifically his brother. And a spy who was killed while the defendant Kandig was on the phone with his killer. Those were separate storylines. So either the jury followed each one of those storylines and found that they were proven beyond a reasonable doubt and met the buckhorn standard, or they didn't. There wouldn't be a reason to have overlap. So why shouldn't defense counsel know well in advance of trial that those are the storylines that are going to be pursued, each of which alone leads to the sentencing announcement? Your Honor, the government provided discovery as to each of those storylines. Right, but how about any others? Were there any other deaths within the discovery? There were. There was the death of Bayreuk Kandig, which I should add is also part of the government's summation. There were others that were not part of the government's summation that were listed in the letter that the government provided. The night before summation. Yes. But so in terms of preparation for trial, the government's position is there could be thousands of deaths in the discovery, any of which we might pursue at trial, but you're not entitled to know until the eve of summation which of those we're going to focus on. Not at all, Your Honor. I would submit that it was obvious because of the limiting principle that's inherent here that the government has to prove this beyond a reasonable doubt that there has to be a nexus to the defendant. The government didn't charge an ISIS-wide conspiracy. The charge in count one was a conspiracy against Kandig and those he worked with. But so it's just up to defense counsel to say, oh, I think there's a thousand potential deaths that may be pursued at trial. These are the ones that I think there's an argument for nexus. I don't need to worry or do any to effectively represent this client. I don't need to do any investigation. I don't need to pursue anything with respect to those deaths because I only see the possibility of the linkage with respect to these. I think the discovery does lay that out. I think there's a couple of things defense counsel could have done. As Your Honor mentioned, they could have requested a bill of particulars. They did not. I would submit because there was not actually any confusion about what this case was about. How does that jive with the district judge's request on the eve of summation? Because it seems like he doesn't feel he can instruct the jury without that guidance. This is somebody who's now sat through trial. Right, and Judge Gerges was very clear on this. He actually said in his comments during that charge conference there were several clear storylines put before the jury of several deaths and said these will not be a surprise. He asked for that letter. We volunteered the letter. He asked for a copy of it. There was some back and forth. It was quite a long discussion. But essentially, he said he wanted to look at the letter in order to determine whether to do a special verdict sheet. The Second Circuit law is clear. We don't need a special verdict sheet. Generally, there's a preference for a general verdict sheet and a clear unanimity instruction. He wanted to think that through about whether to list various deaths or to group them or to simply have a general verdict sheet and ultimately assign it to two groups, Jake Belardi and others. In part, in case this came upon appeal so that there wouldn't be a clear finding of harmless errors to the extent that there was a question about how he handled it. I think that clearly resolves prejudice. There's no unanimity problem. There's no double jeopardy problem. But it's hard to see how it resolves the notice problem from the perspective of what we require effective counsel to do in preparation of defending against an element that has very serious sentencing repercussions. I want to say something up front, Your Honor. I was troubled by the suggestion by defense counsel that they, for five years, have been asking us who died and we didn't tell them. That's not what happened here. There was a complaint. There was years of discovery. There was no request, informal or formal, for a list of deaths ever until the eve of trial. When Mr. Silverman got on the case and filed his letter, the government filed a response, docket 273, that does list the deaths and also lists the evidence. Isn't it inherent in the duplicity motion? Isn't that a component of the duplicity motion as they argued it that we don't know? It is a component. I guess what I'm trying to say is for five years, including through two pretrial week of team depositions, there was never a claim that they didn't know or that the motion to dismiss on duplicity wasn't filed. So now you're claiming it was unfair to you? No, not at all. I'm just trying to figure out what's going on. It certainly wasn't unfair to us. All I'm saying is we believe that everyone in that courtroom had sufficient notice with trying the case because we had discussed this case for five years. You referenced the complaint. Were there any deaths in the complaint that did not then make the final list? No. I would point you to essentially three bodies of information from the pretrial disclosure. One, the complaint, which indicated clearly Jacob Lardy's death and the deaths of the Iraqis that he killed, he and his co-conspirators killed in that attack on Ramadi that day. Two, the 3500 material, which was turned over two years prior to trial, it was very clear from that material at the outset that the government had two key co-operators, Azar Delia, who testified at trial. Azar Delia specified the death of the spy, the death of Bayrat Kanovich, and the second co-operator, the Bosnian witness, whose deposition was taken months before trial. And in the 3500 of that Bosnian witness and in the depositions, all of which happened before trial, the Bosnian witness explained how his father and brother were helped in going to Syria from money, that we put the pieces together, that money came from a Western Union transfer from a defendant, and that his father and his brother and his little siblings died. All you need to do is look at the actual statements of the co-operators and the complaint, which I'm sure defense counsel did. They were very responsible defense counsel. This wasn't buried in some sort of thousands of tweets or videos. These were very clear storylines set forth in key discovery. I will turn to the affidavits since that also came up. The government would note that the affidavits were not just duplicative, but with respect to the specific point that defense counsel ceased to establish, that Bilardi was radicalized while he was in Australia, the government never contested that point. So it wasn't in dispute. The allegation from the government in this trial was that there was a conspiracy, that everyone had a role to play in that conspiracy. Someone got Bilardi to Turkey. Someone got Bilardi across the border into Syria. Someone got his truck with explosives. Someone sent him into Iraq to conduct an attack. And every individual in that conspiracy is responsible for the death that resulted from that conspiracy. And Cannon played a role. His role was to get Bilardi from Istanbul Airport into Syria. That's the evidence that we focused on. And for that reason, the affidavits are immaterial. Thank you. Thank you. If it was so clear, the government would have responded to the numerous requests and just listed the murder victims. So what are the record citations for the requests for the murder victims? So 792 discusses it. I'm sorry, not 792, 292. That's the motion. That's the motion that describes the meeting. Our motion, document 299, which was about the charge. I think it was our reply about objections to the charge. So at the charging conference or pre-trial? These were letters that were provided in advance of the charging conference. So 299, we're talking at trial. Saying we can't believe that the government still hasn't provided this information, making it clear that this was an ongoing, open, very serious issue. And then specific examples. Were there requests before trial? I mean, the government just said that they were never asked in the early years. Well, first, there were different counsel in the early years. And I can't speak to what any counsel did or didn't do or why. That's not in the record, first and foremost. But what's in the record is that in the duplicity motion, it says that the defense never thought that the government was going to try him for murders for victims that were never listed, not even in the superseding indictment. It just wasn't imagined that the government would propose jury instructions near trial saying that we're going to try to hold this person responsible for murders that we have in particular odds. Right? So the defense doesn't know in this time that it should be focusing elsewhere. It finds out very near the trial, and then it promptly acts. That's the reason I was appointed. And there was a meet-and-confirm process, and the government would not answer. And so now it's saying, well, it was clear in the evidence. I would note that in the complaint, in Government Appendix 67, they have a communication between Mr. Kandik and someone, and Mr. Kandik says, don't get a return ticket if you're not going back to Europe. You can easily imagine that that's an investigation. That's a debt that he's going to be accused of being the but-for causa on page 65 of the government's appendix. He provides two updates about killings of Shia and killings of people in Tikrit. That's in the complaint. You can easily imagine that those are debts he's going to be held responsible for. Those weren't actually raised, were they, in the summations? There were certain stories that were raised. And I think what you're saying is that defense counsel were running around chasing down potential deaths that never materialized. Is that the argument? Your Honor, yes. And when Your Honor referred to spillover, that's the argument I just tried to get to the point about conversations that were raised. And that's absolutely true. But for the course of the trial and in the immediate weeks leading up to the trial— During the summations, the government did not bring up specific deaths that defense counsel were unaware of. There were no surprises. Were there? It brought up deaths that were in the discovery, but as we point out, the discovery also contained evidence of a lot of other deaths near Mr. Candid. And moreover, I routinely received 35,000— So there were no surprises in the summation? Well, the surprise was in the nights before the summation, the letter that's at appendix page 486 that says, this is the list of the murder victims and the murders that we're going to seek liability on. So by the time you get to the summation, that's not a surprise. The fact that this was in evidence, no, we never argued, oh, we never received evidence of this. The question is how do you look at this ocean of carnage and the evidence and much of it associated with someone who they say is near al-Baghdadi and near the center of ISIS leadership? How do you determine, as you're about to try a case, when you're really hearing down for trial, how do you determine we have to hold the government to its truth as to this murder, this murder? And when you're formulating your defense trial theory, how do you do that when you're going into the trial? What would be the non-prejudicial relevance to all of the other deaths contained in the discovery? So you're preparing for trial, and you see evidence of all kinds of deaths that are other than Jake Bilardi. And so I would think defense counsel at that point has to make a decision. If what's in their mind is the only death they're going to prove the resulting from is Jake Bilardi, you might imagine a motion in Lemonade to preclude evidence of other deaths on a theory of prejudice outweighing on a 403 theory. And so is that right, or is there some other apparent non-prejudicial relevance to all of those other deaths if it's not related to the indictment's charge of others, including Jake Bilardi? It's an important point, that even with respect to evidence that we ultimately found out was only used to show the existence of the conspiracy or the means and methods of the conspiracy, that we were not able to request a limiting instruction that the jury should not consider this for certain purposes because we didn't know during the trial whether or not those were the killings that he was going to be sought to be held responsible in count one. So while there is not a dispute as to the legitimate purposes of that evidence other than to prove liability, there was no ability to request the ordinary limiting instruction based on the government's refusal. And really, the record does spell this out. It can honestly be described as a refusal to particularize before and during the trial. It was an easily remediable problem, and it was a decision not to remedy it. And as I said, something that the court should consider is what's going to be the effect. They're trying this. This is highly unusual to omnibus murder counts of unlisted victims. They could be on any number of continents over any number of years. And terrorism cases are extreme. But the governments of the party – you know, Mursi Kandak's been in jail in other countries. It was the governments of the party that chose to extradite him here and to treat this as an American criminal prosecution for conduct of terrorism, harming primarily people in Iraq and Syria. When they did that, they had an obligation to give his lawyers the ability to hold them to their proof and to specify murders. And if they don't have to do that, then in the future they won't have to do that in any other kind of domestic murder prosecution. And it's not a parade of marbles. It will happen in short order. And so I would ask the court to keep that in mind. Thank you. Thank you. We'll take the case under advisement.